## THE EDDIE. THE EDGAR, JR. THE BENJ. H. WARFORD. O'BOYLE et al. v. W. F. & R. BOAT BUILDERS, Inc.

(District Court, S. D. New York. July 16, 1924.)

Shipping ⟨⇒27—Seller of barges, with reserved title, held entitled to have proceeds of insurance policy applied in payment of repair bill rather than on other indebtedness of purchaser to repairmen.

Where title to barges, sold under conditional bill of sale, did not pass, seller, on damage to barges, was entitled to have proceeds of insurance policy, payable to him as his interest might appear, paid to repairmen, and applied in payment of claim against such barges, rather than on other indebtedness of purchaser to repairmen, whom it was shown knew that payment represented proceeds of policies and belonged to seller.

In Admiralty. Libel by Anthony O'Boyle, and another, doing business under the trade-name and style of the Liberty Dry Dock & Repair Company, against the barges Eddie, Edgar, Jr., and Benjamin H. Warford, and the W. F. & R. Boat Builders, Inc., claimant. Decree for libelant, with provision for credit to claimant.

Decree affirmed 8 F.(2d) 65.

Macklin, Brown & Van Wyck, of New York City (Pierre M. Brown and Richard F. Lenahan, both of New York City, of counsel), for libelant.

Herbert Green, of New York City, for claimant.

WINSLOW, District Judge. This is a libel filed against the three barges for repair work. In or about November, 1920, claimant, owner of the three barges above mentioned, sold them to one William D. Dittmar under a conditional bill of sale; no title passing. Part payment was made by Dittmar, and, under the contract, Dittmar operated the barges. Title was not to pass until the full purchase price had been paid. It was further provided that the barges should be insured for account of the libelant "as interest may appear." Thereafter the barges were damaged, and were taken by Dittmar to libelant's shipyard to be repaired. The insurance company, after such repair work had been done, paid to Dittmar the net amount of $14,189.39; this amount being less than the bill for the repairs on the three barges. Payment of the loss by the insurance company to Dittmar required the consent of the claimant, which was given. The libelant, upon receipt of the insurance from Dittmar, applied it on antecedent bills for other repair work done by libelant for Dittmar, and not on account of the specific bills for repairs involved in this action.

The only question to be determined by the court is whether this amount thus paid, $14,189.39, should be credited to claimant for the repair work performed by libelant. The evidence satisfies the court beyond a doubt that libelant knew that the boats were owned by claimant at the time he did the repair work, and that they were insured by Dittmar for claimant's account. There was considerable delay in the adjustment of the insurance, and the libelant from time to time asked Dittmar when the insurance money would be paid. The libelant's demands became more urgent as payment of the repair bills was delayed. When the claimant consented that the money be paid by the insurance companies directly to Dittmar, claimant says that he so consented upon the distinct understanding that the money should be received by Dittmar to be applied on these particular repairs. The libelant contends that when he received the insurance money he did not know that the money was the proceeds of the insurance. But the significant fact is that, when the insurance check was received, either Dittmar telephoned libelant, or libelant telephoned Dittmar, that it had been received, and Dittmar said it would be paid the following day to libelant. The fact is that the very next day after its receipt from the insurance company, Dittmar did pay the net amount to libelant.

From the testimony of the witness O'Boyle, which was far from frank, and his responses to interrogations made, I am convinced that O'Boyle knew when the insurance was paid, and knew that it was for the account of claimant, and immediately on the following day, after acquiring such knowledge, received from Dittmar the proceeds thereof.

In view of the large amount of antecedent indebtedness, Dittmar was, to some extent, at the mercy of libelant, and whatever Dittmar may have said at the time of payment as to the application of the insurance, he did not, or could not, control libelant in his attempted application of the moneys to other bills. O'Boyle says that at the time of the payment of this insurance money, however, Dittmar told him that the insurance claim was not yet adjusted. I am satisfied that this is not true. The witness Woods, a member of claimant's concern, testified that the libelant and claimant had adjoining offices in New York City, and that he had talked with libelant concerning the various transactions. The witness Davison has also testified as to conversations which would indicate knowledge of the essential facts on the part of libelant, and, while these conversations, or the substance of them, is denied, I am convinced that, so far as they indicate knowledge on the part of libelant, they have been truthfully stated.

The insurance money belonged to claimant. This is not seriously disputed. I am convinced beyond peradventure that the libelant knew that the money belonged to claimant, as indicated by the testimony of Woods and Davison, as well as the witness James O'Boyle, and that, at the time of the payment by Dittmar to libelant, Dittmar told libelant that the money was the proceeds of the insurance policies, and had previously told them, on the day prior to its receipt, that the money had been paid and would be paid to him on the following day, which was actually done. It is possible, even without this knowledge, that equity might require that the money be applied for claimant's account, but this phase it is unnecessary to consider, in view of the facts found by the court.

An interlocutory decree in favor of libelant will be entered, with the provision that the sum of $14,189.39 received by him be applied as a credit to the claimant.